UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                                    Case No. 04-32662-WRS
                                                         Chapter 11
DORSEY TRAILER COMPANY INC.,

        Debtor

DOUBLE A TRAILER SALES INC.,

        Plaintiff                       Adv. Pro. No. 04-3109-WRS

v.

DORSEY TRAILER COMPANY INC.,
ET AL.,

        Defendants

Double A v. Dorsey

## MEMORANDUM DECISION

This Adversary Proceeding came before the Court for trial on January 7, 2009. Plaintiff Double A Trailer Sales, Inc., was present by counsel Eric J. Breithaupt and Defendant Wachovia Bank, N.A., was present by counsel W. Patton Hahn and Bill D. Bensinger. For the reasons set forth below, judgment is entered for Plaintiff Double A.

### I. Facts

Double A is in the business of selling semi-trailers, doing business at its offices in Delphos, Ohio, selling "Dorsey" trailers for many years. The original Dorsey Trailers, Inc., manufactured semi-trailers at its facility in Elba, Alabama for over 70 years. Dorsey Trailers filed bankruptcy in this Court on December 4, 2000. (Case No. 00-6792)(Dorsey I). The Elba

1

manufacturing facility was sold by the Debtor-in-Possession to the Fruehauf Trailer Corporation Retirement Plan in 2001. Dorsey Trailer Company, Inc., was formed by the Retirement Plan to operate the Elba manufacturing facility. Unfortunately, Dorsey Trailer Company, Inc., also filed bankruptcy in this Court, initiating Case No. 04-32662, on September 14, 2004. (Dorsey II). The Elba trailer manufacturing facility was sold during proceedings in Dorsey II on June 6, 2007, to Pitts Enterprises. (Case No. 04-32662, Doc. 271). Double A has done business with all three incarnations of the Dorsey brand, however, it is its dealings with the second Dorsey entity which are in issue here.

Double A is a large dealer of semi-trailers, which is headquartered in Delphos, Ohio, selling 800 to 1100 trailers per year in its heyday, but only 300 to 400 in recent years with the slumping economy. Double A did business with a number of trailer manufacturers besides Dorsey. Double A President Mark Wannamaker testified that Dorsey trailers were valued because of their durable construction and quality. Wannamaker testified that 80 to 90% of the trailers it sells are specially ordered. At issue here are two orders for a total of 15 trailers.

On October 23, 2003, Double A ordered 10 refrigerated van trailers from Dorsey, which were ultimately intended for sale to the Government. (Pl. Ex. 33, p. 1-7)(The GSA trailers). These trailers were invoiced to Double A under invoice no. M03040, dated January 13, 2004. (Pl. Ex. 4B). On October 29, 2003, Double A ordered five dry van trailers from Dorsey, which were ultimately intended for sale to CRW Trailers. (Pl. Ex. 33, pp. 8-15)(The CRW trailers). The CRW Trailers were invoiced to Double A under invoice no. M03064, in the amount of $93,727.20. (Pl. Ex. 4C). On January 20, 2004, Double A paid Dorsey $659,832.04 on a total of 7 invoices, including the two described above. Vehicle Identification Numbers were assigned to the 15 trailers and Manufactures Statements of Origin were issued and delivered to Double A.

(Pl. Ex. 1 and 5N). It was contemplated by the parties that the trailers would be built in approximately 5 weeks and that Double A would take delivery of the trailers at the Dorsey facility in Elba when they were ready. Had things gone as planned, the trailers would have been delivered by the end of February, 2004.

Also, in January of 2004, Wannamaker began discussions with Chris Street, Dorsey's Manager and Wannamaker's main contact at Dorsey, about the possibility of purchasing Dorsey. That is, Wannamaker considered purchasing the entire corporation. Wannamaker had his accountant in Ohio travel to Elba, Alabama, and begin their due diligence work on a possible purchase of Dorsey. On March 4, 2004, Wannamaker traveled to Elba, Alabama, to meet with Street and other Dorsey representatives. The meeting did not go well. Wannamaker testified that Street had not been honest in his dealings with Double A. The evidence shows that there were discussions for several weeks after the March 4, 2004 meeting, however, nothing came of them.

Dorsey was having severe financial problems during late 2003 and early 2004, the time frame in which the subject trailers were ordered and built. Dorsey defaulted on its $2 million bond to the Alabama Department of Economic and Community Affairs in March of 2004. The bond was secured by a letter of credit issued by SouthTrust Bank. SouthTrust Bank was later acquired by Wachovia Bank. On March 24, 2004, the State of Alabama drew on the letter of credit, thereby taking the State of Alabama out of the picture and made Wachovia Dorsey's largest creditor. The indebtedness owed Wachovia was collateralized by a Security Agreement granting the bank a security interest in substantially all of Dorsey's assets, including raw materials, work in process and finished goods inventory. (Def. Ex. 2).

3

The relationship between Dorsey and Double A soured after the March 4, 2004, meeting and the subject trailers were not delivered. The evidence is not clear on the point of why the 15 trailers were not delivered. It is possible that Dorsey simply did not have the capital to complete the trailers, which were substantially complete, required only a few wheels, tires and liftgates. On the other hand, Dorsey could have been holding the trailers hostage, seeking leverage in its negotiations to sell the corporation.

On May 12, 2004, Double A brought a civil action against Dorsey and Wachovia, seeking injunctive and declaratory relief, in the United States District Court for the Middle District of Alabama, under Civil No. 04-CV0-464. Double A sought possession of the trailers and a declaration that it would take the trailers free and clear of Wachovia's security interest. On September 14, 2004, Dorsey filed a petition in bankruptcy pursuant to Chapter 11 in this Court. The District Court then referred the civil action to this Court. On November 18, 2004, the parties entered into an agreement whereby Double A would take possession of the trailers by posting a bond in the amount of $225,977.20, (Doc. 53, Ex. B). While this began as a suit for possession of the trailers, the parties now are contesting who is entitled to money.

Double A claims that it is a buyer in the ordinary course of business and that it is entitled to possession of the trailers, free and clear of Wachovia's security interest. Wachovia contends that Double A had not taken possession of the trailers as of the date of the petition in bankruptcy and that it was not entitled to possession because the trailers are not "unique" within the meaning of the Uniform Commercial Code.

Having considered the evidence, the Court finds that the trailers in question were purchased by Double A in the ordinary course of business. The purchase of the trailers was made before the discussions concerning the possible acquisition of the corporation. The Court

4

finds that the discussions concerning the purchase of the corporation, which did not come to fruition, were not linked to the purchase of the 15 trailers and therefore, Double A's status as a buyer in the ordinary course, with respect to the 15 trailers, was not tainted by the discussions to purchase the corporation.

At the time of the filing of the petition in bankruptcy, the trailers were still in the possession of Dorsey. Double A argues that it had constructive possession, but the facts are otherwise. Indeed, if Double A had constructive possession, its replevin suit would not have been necessary.

Double A's President Mark Wannamaker testified that in late 2003 and early 2004, the time of intended delivery, there was a seller's market for semi-trailers, with demand then exceeding supply. The Court finds that given market conditions at the time of intended delivery, Double A could not have reasonably covered its obligations to deliver trailers to its customers by way of a purchase from another manufacturer. To be sure, other trailers could have been obtained eventually, however, Double A could not have met the needs of its purchasers. For purposes of this suit, the trailers were unique.

## II. Law

At trial, the parties offered evidence and arguments in support of their positions. Upon consideration of the evidence and arguments in light of the relevant law, this Court is now prepared to rule.

A security agreement between a lender and debtor is effective against purchasers of the lender's collateral, and the security interest it creates continues in the collateral notwithstanding its sale. *See* ALA. CODE §§ 7-1-201, 7-9A-315. A purchaser of personal goods takes subject to any security interest in the goods held by a secured lender. However, an exception to this rule

5

Case 04-03109 Doc 80 Filed 03/20/09 Entered 03/20/09 17:02:53 Desc Main
Document Page 5 of 10

allows a purchaser of goods subject to a lender's perfected security interest to take free and clear of that security interest. The lender's security interest is cut off when the buyer of the collateral becomes a buyer in the ordinary course. ALA. CODE §§ 7-9A-320(a) (former 7-9-307(1)), 7-1-201(9).

This exception gives rise to the main point of contention in this case – whether Double A became a buyer in the ordinary course when they purchased from Dorsey the fifteen trailers at issue in this case. The controlling law on this point is Alabama Code Section 7-9A-320(a), which provides that "a buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." In order to qualify as a "buyer in the ordinary course of business" one must meet the requirements of section 7-9A-201(9), that is be a:

> person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the **usual or customary practices in the kind of business in which the seller is engaged** or with the seller's own usual or customary practices.… Only a buyer that **takes possession of the goods** or **has a right to recover the goods** from the seller under Article 2 may be a buyer in ordinary course of business.
>
> ALA. CODE § 7-1-201(9) (emphasis added).

This statute is the basis for issues of material facts tried in this case, each addressed here in turn.

### A. Ordinary Course of Business

The first question is whether Double A purchased the trailers in the ordinary course of Dorsey's business. Section 7-1-201(9) provides that a sale in the ordinary course of business occurs "if the sale to the person comports with the usual or customary practices" of the seller. This definition requires that the buyer in ordinary course buy from a seller who ordinarily sells similar goods. A sale in the ordinary course of business is generally an arm's length transaction for an adequate price. Morey Machinery Co., Inc. v. Great Western Industrial Machinery Co.,

6

507 F.2d 987, 990 (5th Cir. 1975), <u>Franklin v. First Nat. Bank of Morrill, Neb.</u>, 848 P.2d 775, (Wyo. 1993). Whether transaction accords with customs in industry is critical in determining buyer in ordinary course of business status, not delivery of goods. <u>Finance America Commercial Corp. v. Econo Coach, Inc.</u>, 118 Ill. App. 3d 385, 388-89, 73 Ill.Dec. 878, 454 N.E. 2d 1127 (1983); <u>e.g.</u> <u>Ace Equipment Sales, Inc. v. H.O. Penn Machinery Co., Inc.</u>, 88 Conn. App. 687, 871 A.2d 402, (Conn. App. 2005) (where the industry custom was for the buyer not to take immediate possession of the purchased goods).

Here the sale of the trailers was done in the usual or customary practice in the trailer sales business and in Dorsey's usual and customary practices. Double A was one of Dorsey's longstanding customers having ordered over 800 trailers from Dorsey in the year leading up to Dorsey's bankruptcy filing. According to Mark Wannemacher's uncontroverted testimony, Dorsey would usually bill Double A for trailers in production anywhere from ten days to two weeks before the units were available for delivery. The typical production time was five weeks and Dorsey would not deliver until full payment had been made for the trailers. Beginning in the fall of 2003, Double A began to pre-pay for more of its orders to Dorsey. Mr. Wannemacher testified that it was common in the trailer industry to pre-pay for orders which include specialty items like the trailers at issue here.

On January 20, 2004, Double A remitted payment to Dorsey for the purchase of the GSA trailers and the CRW trailers. Mr. Wannemacher testified that Double A did not pursue any acquisition of Dorsey nor did Double A conduct any further business with Dorsey. Mr. Wannemacher had personal knowledge regarding how transactions, like the one at issue here, are ordinarily structured in the trailer industry, for this reason the Court gives great weight to his testimony. He indicated that Double A's purchase of these trailers was no different than the

7

Case 04-03109   Doc 80   Filed 03/20/09   Entered 03/20/09 17:02:53   Desc Main
Document      Page 7 of 10

hundreds of trailer it had previously purchased from Dorsey.  The fact that Double A later found out about Dorsey's poor financial condition at the time when the trailers were purchases is immaterial; what matters is that the sale of the trailers by Dorsey to Double A was in the ordinary course of Dorsey's business at the time when the sale was consummated.

### B.  Double A's Right to Recover Trailers

Having decided that Double A's purchase of the trailers was in the ordinary course of Dorsey's business at the time of the sale, the Court is left with the question of whether Double A had possession or the right to recover the goods.  State law mandates that a buyer must either take possession of the goods or acquire a right to recover the goods from the seller under before they become a buyer in the ordinary course.  ALA. CODE § 7-1-201(9).  It is undisputed that Double A never took physical possession of the trailers, however they did acquire a right to recover possession of goods from Dorsey establishing their status as a buyer in the ordinary course.

The Official Comment to section 7-1-201 of the Alabama Commercial Code identifies section 7-2-716 as the relevant part of Article 2 that determines when a buyer acquires the right to recover possession of goods from a seller.  One of the ways a buyer may recover goods is specific performance which "may be decreed where the goods are unique or in other proper circumstances." ALA. CODE § 7-2-716.  "Under the U.C.C. a more liberal test in determining entitlement to specific performance has been established than the test one must meet for classic equitable relief." Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F. Supp. 429, 442-43 (S.D. Fla. 1975) appeal dismissed per curiam 443 F.2d 1364 (9th Cir. 1971).  The comments explains that

8

"uniqueness is not the sole basis of the remedy under this section for the relief may also be granted 'in other proper circumstances' and inability to cover is strong evidence of 'other proper circumstances'." "The scarcity of a chattel has been recognized as an important factor in determining whether specific performance of a contract for its sale will be granted." <u>Madariaga v. Morris</u>, 639 S.W.2d 709, 711 (Tex. App. 1982) (citing 71 Am.Jur.2d, Specific Performance §§ 153 and 156). One court has restated the test for specific performance as follows: "[b]asically courts now determine whether goods are replaceable as a practical matter-for example, whether it would be difficult to obtain similar goods on the open market." <u>Magellan Int'l Corp. v. Salzgitter Handel GmbH</u>, 76 F. Supp. 2d 919, 926 (N.D. Ill. 1999).

The parties here disagree as to whether the trailers where "unique" within the meaning of this statute. However, there exists uncontroverted evidence which shows that Double A could not have reasonably covered its obligations to deliver trailers to its customers by way of purchase from another manufacturer. At the time of intended delivery there was a seller's market for semi-trailers due to scarcity of certain raw materials required for the manufacture of the type of trailers at issue here. This market condition is further evidenced by the fact that Dorsey required prepayment for the trailers from Double A. Double A could have not have reasonably covered its obligation to its customers. Therefore, the equitably remedy of specific performance is available to Double A here. Having made this showing Double A satisfies the second requirement of section 7-1-201(9).

9

## III.  CONCLUSION

For the reasons set forth above, Double A qualifies as a "buyer in the ordinary course of business" of the trailers in question.  The Court concludes that Double A purchased the trailers free and clear of the blanket security interest that Dorsey granted to Wachovia.  The detinue bond posted by Double A is to be discharged.   Judgment will be entered in favor of Plaintiff Double A by way of a separate document.

Done this 20th day of March, 2009.

/s/ William R. Sawyer
 United States Bankruptcy Judge

c:  Eric Breithaupt, Attorney for Double A
    Bill D. Bensinger, Attorney for Wachovia